Good morning, your honors. John Ballas on behalf of Troy Urie. I'm going to concentrate my argument on the prosecutorial misconduct in vouching, the third argument in my brief. I don't think I'm going to use up my entire 20 minutes today. This case involves repeated instances of vouching and misconduct during the cross-examination of the defendant and during closing argument. The government has conceded that some of the instances were misconduct and other times they're arguing that there was no error or that their response was invited by the defendant's statements. I want to go through each of them, at least the most significant ones. During the cross-examination of the defendant, the prosecutor asked the defendant, Mr. Urie, to, a couple times, to call the agent a liar, and particularly asked whether he made up a confession. This Court's precedents have shown that that is clearly an error. You're not supposed to ask one witness to judge. Talk about another witness for the Prosecutor has two responses to that. One is that I'm sorry, you said a couple of times, did you? That was the one that said E.R.? That was one at E.R. at excerpts of record 60. Actually, at the supplemental excerpts of record 90 and 91, there's two other responses close to each other. And supplemental excerpts of record 90, the prosecutor again asked him, in terms of receiving the driver's license, whether he asked whether the agent made it up out of whole cloth. And then at supplemental excerpts of record 91, he again asked if agent Hartley put in knew it was a scam after Urie signed the notes. And so there's actually two, there's actually three instances, two of them close together. These responses, these questioning of the defendant can in no way be viewed as a proper response to the defendant's direct testimony. On direct testimony, the defense attorney asked his client properly, did you hear the testimony of the agent? Did you say those things that the agent said you testified? Did he say what you said? And the defendant said in each instance, I heard the testimony, I didn't say that. It's entirely proper questioning. The prosecutor's questioning of the defendant is in no way an invited response to the defendant. During the closing, the prejudice to that is magnified because there's three instances of closing, at excerpt of record 84, 94, and 99 to 100, where the prosecutor says in the closing, in order to acquit the defendant, Troy Urie, you have to believe the government witnesses are lying. The first time at excerpt of record 84, he said you have to believe McGuire and Blanchard, the two cooperating defendants, were lying. At excerpt of record 94, he says you have to believe the three FBI agents were lying. And then at excerpt of record 99 to 100, you have to, he says, you have to believe all the witnesses were lying, and then goes into another improper reference to the O.J. Simpson trial. The government has conceded that that, those lines of argument is improper under the Ninth Circuit case law. I think further, there's kind of even a more egregious misconduct occurs at excerpt of record 84 that the government admits his error when the prosecutor tells the jury that in order to acquit, you have to believe that all the FBI agents are committing perjury. And he refers to the FBI agents' years of experience, saying one has 10 years of experience, one has 17 years of experience, and the other has 19 years. In particular, and the government has conceded, conceded this is, this is not the case. The next kind of improper argument is in terms of arguing outside the record on a very significant point at the trial. During the trial, the defendant, Troy Urey, testified that he did buy a cashier's check that was later used as a down payment for the warehouse where the scheme unfolded. But he did, though, at the direction of another person named Lottie, and he did not know there was anything, there was no fraud. The agent had testified at the trial that the defendant told him that he received a fake driver's license in the mail from Lottie, or Dee, and that he showed, and that he used that. That's when he knew it was a scam. The defendant said he never told that to the agent, never got, received a fake driver's license. And when he went to buy the cashier's check, he told the teller that it should be purchased in the name of Steve Bruton, but he never said that he was Steve Bruton. He said, in fact, that the reason he did that was Lottie said that it was his business partner, Steve Bruton, and that's the person to get the name under. So the defense made the argument in their closing, which is entirely proper, that the government could have called the teller if they wanted to prove they used a fake ID to purchase the cashier's check, but they didn't do it. The prosecution, the prosecutor, argued outside the record by saying, well, we could have called that teller, and that would have cleared it all up. Right now I want to interject. We're reading a cold transcript, okay? You just said that the, and I don't know how to read this, I really don't. I don't read it the way you do, at least you're starting to, because you're not quoting the language. And I think it's important to quote the language, because I'd like to understand this record, what we should assume from this. The tone, the tenor of the prosecutor's argument style that comes across in this is a bit give me a break type of approach to things. And you just said that defense counsel argued properly that they failed to call a witness. So when we get to ER 95, what the prosecutor says, we didn't call the teller. That would have cleared everything up. Now, I don't know whether he's paraphrasing and rhetorically gesturing toward the defense argument, or whether he is in fact doing what you are suggesting clearly would be improper, that we didn't call the teller, i.e., if we had, that would have cleared everything up. What do we do with a record like that, where there are two possible readings, depending on the inflection of the argument? I think the most reasonable reading, those two lines together, that the reasonable interpretation that the jury would take from it is that they could have called the teller, and the teller would have testified favorably for the defense, for the government. Well, yes, but if he starts it off saying, if his tone of voice to the jury is, we didn't call the teller. That would have cleared everything up. So the jury understands he's referring, paraphrasing what the defense counsel argued. He then goes and said, we called Sue Peratt of Wells Fargo, blah, blah, blah. And he goes on and argues that. I just don't see it that way. In terms of that second sentence, that would have cleared everything up, it sounds, on the record, and I guess all we have is that cold record. But I think in context, the most normal interpretation would be that we could have called the witness, and it would have cleared it up. That would have cleared everything up. That's a natural reading of that sentence. I think it would have been proper for the rest of the prosecutor's argument is that, to respond to the defense, that we did call this other person and that she talked about the bank record, she talked about the photo. That was sufficient to prove our point. But there was no reason to start off by saying we didn't call the teller. If you could have said we didn't call the teller, it wasn't necessary because we called Sue Peratt. We had other evidence that was sufficient. But by saying that would have cleared everything up, I think that the natural reading of that, the import that the jury would get, is that the teller would have corroborated their position. There's no objection. There's no objection. We're sort of stuck with what's there. That's right. Okay. What effect did the curative instruction have? Well, there was no curative instruction given. If it was given, it would have made some difference. But there was no objection made and no instruction given. As to any of the voucher? Correct. Okay. So under all these reasons, I think that it meets the plain error standard. And this Court has reversed in a number of cases under the plain error standard in similar circumstances. And they've generally done that when the evidence is not overwhelming or where it depends on the witness's credibility. And that's Weatherspoon, Kerr, Combs, Smith, these four cases that I reversed. And I think this case fits in that. And if you look at it, there was no real direct evidence of his involvement. It was all primarily from the cooperating witnesses who said he was involved, as well as this kind of big dispute between the defendant and the agent of what he said when they went to interview him shortly after they arrested the other defendants. The 404B evidence? It was a 404B evidence. The only evidence that Troy Ruray, the defendant, was involved in that was, again, the cooperating defendant, Katie McGuire. And there were phone records that he made a large number of phone calls to the people. But there's no evidence of what was said during any of those phone calls. The other thing that's very significant here is that the jury deliberated a very long time. The case itself, there's only approximately three days of evidence. I said in my briefs that the jury deliberated almost two days. When I was reviewing it again and looking at the transcripts and looking at Excerpt of Record 120 with the docket sheet, it actually deliberated almost four full days. It went out on the morning of August 24th, Tuesday. They had a note later in that day. The jury was brought back for some further discussions the following day, the 25th. On the 26th, they deliberated the entire day. There's no notes or anything. And it wasn't until the 27th, late in the day until 4 o'clock, after they did come back and have another note and further discussion, that they finally returned the verdict. Any of the notes relate to the problems you're raising here? No. So I think I will reserve my remaining time for rebuttal. Thank you. May it please the Court. Thomas Flynn for the United States. Before I get into the individual instances, I'd like to mention three principles that I think are important here. One is that this is a plain error case. The defendant never objected to any of these things. And I think as I go through this, that will play in at several points because the main result of that is that it is the defendant's burden to show prejudice, to show the error, and finally to show the last factor, that it impacts this Court's reputation and integrity. I'd also like the Court to keep in mind as I go through this that the defendant relies a lot on this Weatherspoon case. And I think there are a couple of things that we have to realize about that case before we get into the details of it. There were two separate kinds of error in that case. One is the kind of instances we're talking about here where the prosecutor was making references to various people lying and so forth. But the other was that the prosecutor made this argument about appealing to the man off the street. The panel majority discusses both of those and concludes that that would have been plain error. They don't decide which standard applies, but that that was sufficient enough for plain error. Then in its concurrence, Judge Trott disagrees with the majority on the first part, but nevertheless concurs with them on the grounds that the latter argument was in itself enough to make it plain error. Now, I think... He didn't make the... His concurrence wasn't necessary to the majority, though, was it? No, it was not. But I think the fact that he felt that that latter part was enough in itself to make it plain error means that we can't tell from the majority opinion whether they would have thought the comments about lying and so forth were in themselves enough to make this a plain error case. They looked at all of this evidence as a whole, and then they conclude at the end of the opinion that all of it together made for plain error. But Judge Trott writes he's not the opinion of the Ninth Circuit necessarily. That's correct. I agree with that, Your Honor. As much as we love him and respect him. Yes. And as much as I wish he had been on the majority in this case. But I think that's just something to keep in mind, not only here, but in the rest of the cases that the defendant cites. I think we have those in mind. Why don't you – maybe you could address in the context. All right. I'm going to start with this. You have conceded that some of it was improper vouching. I have. I'd sort of like to. What do we do? Sort out. Well, that's what I'm prepared to do. First of all, I'd like to talk about those ones which I think were not improper comments. And the first one is this one about the ID that the defense was talking with the court about. And I think that it's important to realize what happens here. The government did not. Pardon? Which one are you addressing? This is the one where they claim that we made an improper comment about not calling the teller to say that he used an ID. This all comes out when the defense, and this is on page 511 of the reporter's transcript, which I have at the supplemental excerpt of record of page 143. The defense is the one who brings this up. And what they say is if the government felt that there was something untoward about the purchase of the cashier's check between Mr. Urey and the teller, how difficult would it have been to call the teller? Have the teller testified? I reviewed the records, and I remember this guy came in, and he showed me a fake ID that said Steve Bruton. Well, that's the to me, this is a straw man that the defendant is throwing up. We never said this. The defense throws this up. They set up a straw man. They do it all the time. I know. And I think that the response. They could have called the teller, but they didn't because it's not what they're looking for. They're looking for something specific. Right. Now what? We are entitled at that point to say we don't have to call the teller. And that's what I think this says. I think you need to go back, as I think, Judge Fischer, you were starting to do, to look at what happened before the prosecutor's comments. And what you're correct is he is going through the defendant's arguments, because this is, after all, his rebuttal, and he's ticking off at the beginning of each of his comments what he's talking about. For instance, I'm now on page 175 of the supplemental excerpt of the record, where he says, we heard how Urie bought the check in his own bank. Who would do that? Then the next paragraph, he didn't do anything to distinguish himself that he didn't buy it. Yeah. Then again, again, I'm like, what? He is characterizing all through this what the defense is, what their contentions are, and then the rest of these paragraphs are his rebuttal. So the first part of this is just a summary of what the defense said. We didn't call the teller. That would have cleared everything up. That's exactly what the defense was claiming. The government should have called the teller to clear things up. And instead, he says what we did. We called this representative of Wells Fargo. She showed us the pictures. The pictures showed that Urie was buying the check. The records that she produced showed it was purchased in the name of Steve Bruton. That was enough. That seemed to make the point we needed to make. All we needed to prove, all we ever argued, we never argued in our argument, if you look through this, that Troy Urie showed up with an ID. Our argument was purely that he was there, he bought the check, and he bought it in the name of Steve Bruton. Okay, so let's go on to, because I want to get to the prejudice that you set up. You do concede vouchers. So which ones do you concede are vouchers? Only the ones about where he says you have to believe all these people are lying. Okay. And he says that in various ways. In various ways, he does. In the cross-examination and in argument. Yes. Okay. I don't, I'm trying to think of whether he said that in the cross-examination. Yes, he did. But that instance, when he says it in the cross-examination, I'm not prepared to concede that that was improper. Okay. Do you want me to address that? No. Let's, now we have improper vouching where essentially the credibility of the government has been put behind it. Well. Invoking all the things that caused it to be vouching. I don't agree. What do we do with that? I don't agree with the last statement. I'm conceding that under Weatherspoon, he shouldn't have done this. But if you look at these. That's what vouching is, where you. Well, this is where the disagreement between Judge Trott and the majority is. The majority doesn't say that we're putting the government's authority behind it. In fact, that's what they criticized Judge Trott for accusing them of. He says that we should limit it to that. And they say, no, no, we don't limit it to that. It's broader than that. So it's improper. These guys put their years of service with the FBI. He isn't putting the government's credibility behind it. In any event, it's vouching. Okay. So why isn't what the improper vouching, why isn't it prejudicial in this case? Well, the question isn't whether it's prejudicial. The question is whether it's prejudicial enough that this guy deserves a new trial. And there are several reasons, I think, for that. As all of the cases say, you don't look at these statements in isolation. You look at them in the context of the trial. And when you look at some of these statements, let's just take, for instance, the one where he's saying, you have to believe all of the government's witnesses are lying. What he says is, he first, he does say that. What's your site on that? I have one, but I need to get on the same page. This is at, here. This is, I'm looking at the supplemental excerpt of record at 120. Well, give me the RTE chart. 488, Your Honor. Go ahead. Okay. He starts off, I mean, you have to look at the context in which he says this. Starting on page, reporter's transcript 550, or excuse me, 487, he starts off by saying correctly that the judge will instruct you to use reasonable doubt, doubt based on reasonable common sense. As jurors, that's what you bring to this process, your reason and common sense. So the whole context of this is what's reasonable, what's common sense. In order to find Uri not guilty, you would have to abandon completely your reason and common sense. You would have to ignore the testimony or conclusion that basically every other witness you heard from was lying, except, of course, Uri. Now, the cases say he's not supposed to say that, but I will say that is the state of the evidence. That is true. And that statement, I think, does not put the prestige of the government behind anything. It just states a fact. You either believe the defendant or you believe the government's witnesses. He does not get bogged down. He said if you look at the whole thing. Right. So let's move on. Okay. Of all of the persons you heard in this trial, who had the biggest motivation to lie? Then in speaking about Katie McGuire and Nicodemus Blanchard, he says, first of all, the implication that they don't have a motivation to lie and they're backed by statements that they've made. You have to believe that the phone records. And then he gets to the statement about the FBI agents, which I admit is not true. But I'm not trying to argue that he should have made this argument, but I'm saying that they are embedded in larger arguments about the credibility of the jury that make them less blatant than, for instance, the statements that are made in Weatherspoon where he's just flat out hammering on these agents are lying. These agents are lying. I'm assuming the agents are not lying. The other part of this, I think, which needs to be considered and which I disagree with Mr. Ballas on here. So just to play it out. Yes. The sound of this made me not able to hear what you first said. Were there instructions in this case with respect to the cooperating defendants that they view that testimony as skepticism? Yes. Okay. So they hear that, and they're the ones who are pointing the finger. It's the so-called direct evidence, if you will, or indirect from the cover. So why don't the FBI agents then loom very large in this picture such that if there's any doubt in the jurors' minds whether these cooperating defendants, who they're supposed to view as skepticism, that in order to tip in favor of the defendant, they'd also have to feel that the FBI agents would put their long-time careers at risk. Don't you think that that is precisely the kind of tipping finger on the scale that the vouching jurisprudence is designed to avoid? According to Weatherspoon, that is true. But you also have to – it's not every time that someone says this, it's automatic reversal. First of all, this is a plain error case. And I'm not aware of any plain error case that has reversed simply for that. There is always something else. For instance, one of the cases the defendants – Well, I tried to just give you something else. Pardon? First of all, I don't think it depends just on the credibility of the agents. There's a lot more evidence in this case that is circumstantial but is completely independent of the agents. And the government stressed that in its closing arguments. This is a credibility case, in my view. This is a credibility case. Those two cooperating defendants, their credibility, the agents' credibility, URI's credibility. Then you've got some collateral phone records and 404B evidence, which also triggers some questions of credibility. I think in many cases of credibility case, this is one. Well, I just have to disagree. Why don't you tell me why it is? I'd like to tell you why it's not. First of all, it's not just that they have some phone records. Let me point out, for instance, that with respect to the earlier incident, the 404B incident, on that Friday there were 39 phone calls from this man, Lottie, to the defendant and 124 phone calls to Gary Orgy and Katie McGuire. And the previous Friday, which is no different from this Friday except for the Agilent incident, is nothing like that. There's nowhere near that number of calls. That's a lot of telephone calls, and they all cluster around the time of the incident at Agilent. It's 124 phone calls. That's a lot. At the time of the incident that they're charged with, there are 16 phone calls that Lottie makes to URI, in which URI himself says that the content of those phone calls is Lottie asking me, have you talked to Orgy yet? Have you talked to Orgy yet? Well, URI's story is that I don't have anything to do with what's going on there. I was offered a job there, and I turned it down. Why is this guy Lottie calling me to ask about Orgy? And then right after the agents are arrested, there is a 40-minute telephone call between Lottie and the defendant. What are they talking about for 40 minutes? He's turned down the job. The only reasonable implication from a phone call of that length is that they're talking about what went wrong. Something clearly has gone wrong here. Where did it screw up? And if Lottie is trying to get a hold of Orgy, why is he calling URI? Why isn't he calling Orgy himself? Why is URI in the middle of all these phone calls of an incident he had absolutely nothing to do about? Another point. Imagine this warehouse. Here's an empty warehouse that the defendant says he turned down a job to sell computers from there, and he knew that computers were going to be delivered there because it was going to be a computer store. They go up there. They put this sign from some company that nobody's ever heard of. It's an empty warehouse. All it's got is a table, some non-functioning equipment. It doesn't even have a CPU on it. There's no Internet service or anything there. There's no decorations on the inside. Orgy goes from Reno to San Jose. He picks up URI. URI goes with Orgy to Sacramento. They put up the signs. They buy this stuff. They put it in the store. Orgy then goes all the way back to San Jose and presumably then goes home where he's a bookie in Reno. That makes no sense. First of all, why is URI in this? He says, well, I do lots of favors for my friends. Well, if he's doing favors for his friends, why would this friend drive all the way to San Jose to pick him up to go to Sacramento? None of these things make any sense at all. Then there's this business about the check, which I think, and I think the jury would think, is just preposterous on its face. If this man Lottie wants to get money to a leasing company in Pleasant Hill, why is he wiring this money to URI so that URI can turn it into a check and then take it over to this company? Why doesn't he just wire the money to the company? These are all computer people. They're going to wire money to somebody to buy a check? So there is a lot of other evidence here. The other thing I would like to point out about the evidence, if I may, is Government's Exhibit 47, which the defense moved into evidence. And this bears on all this in a lot of different ways. There was a lot of comment about this statement at the bottom, knew it was a scam. And the defendant objects to the prosecutor's reference to that. If you read through that part, and I'm prepared to do that, what the prosecutor is doing by asking him, do you say that the agent made all of this up? It's because the defendant's story about that, namely that it wasn't there, doesn't make any sense. When the defendant is asked on direct examination, did you know that that statement, knew it was a scam, did you know that was there? He says, no, I didn't know whether it was there or not. But this is important because his statement, the defendant's statement that he wrote on here in his own handwriting, reviewed with Special Agent Paul Artley and Troy Urey. On direct examination, he's saying, well, I didn't really review it. He never read it to me. I just kind of signed it. He told me to. When the prosecutors cross-examining him, what he's trying to point out is there's not just this statement, knew it was a scam. If you look up higher, there's lots of incriminating statements in here. Troy Urey asks Lottie about what to say if the police ask questions. Katie told by Troy Urey, say when to be there. Excuse me, by Troy Urey and Gary, when to be there. Katie would receive them and put them in the warehouse, wait until shipments come. Lottie continued to say shipment would be there every day. These are all very incriminating statements. And unlike the last one, they could not have been added later because they're part of a continuing flow of the text. And if he had added all of those later, there would be no sense to put this line and the comments here at the bottom. So what the prosecutor is trying to get Urey to commit to is whether he just didn't see this at the bottom or whether he's saying the agent added it, because if the agent added it, then the rest of this doesn't make any sense. Why would the agent just add this one when there's all of this incriminating evidence? So if you look at what the prosecutor says, he says, are you saying that Special Agent Artley made all of this up? Because he hadn't said that before. And he gets him to say, yes, yes, this statement, knew it was a scam, was not there before. So this is all made up. But this document in which the defendant essentially confesses, in which he himself admitted into evidence, says in many places above that where Artley could not have added it after he signed it, that he was guilty. And the defendant has never challenged any of those statements. They couldn't have been added later. So the government's position is that there is a lot of evidence ignored by the defense. And if you take that and set it against the statements that the agent shouldn't have made and the fact that in saying those, maybe the Court doesn't agree with this, the government did not say, did not put its weight behind it. It's just, it's more in the nature of a summary of the evidence, which we're not supposed to say, that it's not plain error. And even if it is, I'd like the Court to remember that the Supreme Court of the government would take away from this case that saying that the agents put their term of service on the line. It's not summarizing the evidence. I realize that. Sure. May I finish that last sentence? Yes. I'm over my time. It's just that even if this is plain error, there is the additional finding that this Court has to make, that this impugns the integrity of the reputation of the courts. And given the way this trial went and the fact that nobody objected to any of this, I don't think it did that. And I think the Court should affirm. Thank you. Thank you. I want to start by emphasizing that all the instances of improper cross-examination that I pointed out and all the instances in the closing argument all had to do with credibility disputes, which was the key part of this case. They all had to do about whether the witnesses were lying. They all had to do about what the defendant said to the agent the day after his arrest. So they were all points that kind of emphasized what was the key issue of this case. And I think that's very important here. The second thing I want to say is the government has mentioned a few times that we're relying on Weatherspoon, Weatherspoon, Weatherspoon, but it's not just Weatherspoon. The part about it's improper to tell agents, to tell the jury that agents are risking their careers was also found to be plain error in the Combs case. All the other instances of improper argument or examination that I pointed out, there's a number of cases on each one of those points that find it to be an error and sometimes plain error. In terms of the overall evidence here, the government tries to make much of a few little things, but the bottom line is it was two cooperating defendants and the testimony of the agents versus the defendant, Troy Urey, and his testimony to the jury. The jury did not find Troy's testimony to be so unbelievable as the prosecutor did in that they were out four days when the testimony of the trial itself only took three days. In terms of the statements that he signed, the agent's notes on the bottom, that he reviewed it, Troy gave an explanation for that, that the agent asked him to sign it, he did just sign it, but he didn't review the whole thing and he never agreed that he said that. And when he went up on the stand and he testified, he adamantly denied over and over again that he said those things that were in that statement. And finally, in terms of the phone records, the prosecutor pointed out there was over 100 phone calls between Troy, Katie McGuire, Glady, and Orgy on one instance. I want to stress again that that was not on the charge crime. That was on a prior 404B prior fraud. And also Troy explained that as well. Over 55 of those calls were less than 30 seconds. That's what the phone records show. He explained he was in an area of poor reception and he had to keep making calls over and over again. He gave explanations for reasons of why he was making those calls that had nothing to do with the fraud. And when it came down to it, it was the credibility of Troy versus the cooperating defendants and the agents. That's what the jury had trouble with and that's what this improper vouching went to. Thank you. All right, counsel. Thank you for the argument. The case argued is submitted and we will stand both in recess and adjournment or adjournment and recess, whichever it is. Thank you all. Thank you. This court is in recession and adjourned. No problem. Do you want me to get back?
judges: Beezer, Fisher, Timlin